1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7   ROBERT McDANIELS,                          No. C 05-0904 PJH (PR)

8              Petitioner,                      **ORDER DENYING PETITION**
                                                **FOR WRIT OF HABEAS**
9      vs.                                      **CORPUS**

10  R.J. KIRKAND, Warden,

11             Respondent.
                                         /
12

13          This is a habeas case filed pro se by a state prisoner.  Petitioner was granted a stay

14  of the case while he exhausted additional claims.  After exhausting such claims, he filed an

15  amended petition on June 12, 2006.  The court reopened the case, dismissed four claims in

16  the amended petition because they were not cognizable, and ordered respondent to show

17  cause why the amended petition should not be granted based on the remaining, cognizable

18  claims.  Respondent has filed an answer and a memorandum of points and authorities in

19  support of it, and has lodged exhibits with the court.  Petitioner has responded with a

20  traverse and a supporting memorandum.  Respondent has replied to the traverse, and

21  petitioner has filed a response to the reply.  For the reasons set out below, the petition[1] will

22  be denied.

23                              **BACKGROUND**

24          In 1997, petitioner and his co-defendant, Keelon Jenkins, were convicted of first-

25  degree murder and various related charges in Alameda County Superior Court.  On appeal,

26  the California Court of Appeal reversed their convictions after finding that the trial court had

27  _____

28          [1]The court hereinafter refers to the June 12, 2006 amended petition simply as the
    petition.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  coerced the jury during the course of deliberations.  In 2001, petitioner and Jenkins were
2  re-tried in Alameda County Superior Court, and again the jury found them both guilty of
3  first-degree murder (Cal. Pen. Code § 187).  The jury also found true the special
4  circumstance allegations against Jenkins that he was an accomplice to the murder
5  committed in the course of an attempted robbery, and that he had used a firearm.  In
6  addition, the jury convicted Jenkins of assault with a deadly weapon (Cal. Pen. Code §
7  245).  The trial court sentenced petitioner to a term of twenty-five years to life in state
8  prison.  The California Court of Appeal affirmed the conviction and sentence.
9  Subsequently, the California Supreme Court of California denied the petition for review and
10 a later petition for a writ of habeas corpus.

11        The convictions of Petitioner and Jenkins stem from their bungled attempt to rob a
12 Brinks truck in Berkeley, California.  On the morning of September 20, 1994, the Brinks
13 truck parked outside a branch of the Wells Fargo Bank, where petitioner and his co-
14 defendant Jenkins were waiting.  Jeffrey Spencer, a Brinks guard, was unloading money
15 from the back of the truck while the truck driver remained in the cab.  Jenkins, disguised in
16 women's clothing and a wig, approached the truck and pointed his gun at Spencer.  While
17 petitioner approached from a different spot, also with a gun, Spencer and Jenkins
18 exchanged gunfire.  Spencer fell to the ground and was later pronounced dead from
19 gunshot wounds.  The shooting was captured on the bank's video surveillance tapes, which
20 was played to the jury.

21        Upon hearing the gunfire, the Brinks truck driver, Antoine Narcisse, called for help.
22 Jenkins and petitioner fled through the bank's parking lot.  While running away, Jenkins
23 dropped the gun that was later determined to have fired the shots that killed Spencer.
24 Jenkins and petitioner got into a car, and petitioner drove it away.  At about 10:50 that
25 morning, the police found the car abandoned about three miles away, with the engine still
26 warm.  Petitioner's palm print was found on the inside of the driver's side door, and
27 Jenkins's palm print was found on the outside of the passenger door.

28        The car was identified as belonging to Sel Butler, an Oakland resident.  Four days

United States District Court

For the Northern District of California

1   earlier, on September 16, 1994, at approximately 1:30 a.m., Butler and his nephew were

2   parked at a gas station in Oakland.  Butler saw two men approach the car, one of whom he

3   recognized as petitioner.  The other man pulled out a gun, the two of them ordered Butler to

4   give up the car, Butler and his passenger ran away, and petitioner and his companion

5   drove off in Butler's car.  Petitioner testified at trial that he did not participate in stealing

6   Butler's car.  He testified that when he and James Felix approached the gas station that

7   evening, Felix, without warning petitioner, pointed his gun at Butler, ordered him out of the

8   car, and drove Butler's car away by himself.

9        Petitioner's aunt, Jeanelle Ingram, testified that on the evening of the Brinks incident,

10  petitioner and his girlfriend were waiting for Ingram at her house in San Leandro when she

11  returned from work.  Petitioner explained to Ingram that he and another man had been

12  observing the routine of the Brinks deliveries, and that they had intended to steal money

13  but not hurt anybody.  Ingram told petitioner to go to the police, but he wanted to go find his

14  grandmother in Chicago.

15       On September 27, 1994, petitioner was arrested at a train station in Chicago, at

16  which time he gave the police a false name and date of birth.  On February 15, 1995,

17  Jenkins was arrested on a bus in Montana, wearing a wig and a penciled-in moustache,

18  and holding a ticket under the alias William Wilder.

19       Petitioner and Jenkins each testified in their own defense.  According to both of

20  them, a man named Valentine told them that he had a connection to a Brinks guard who

21  would cooperate in a staged robbery.  The plan, hatched by Valentine, was for Jenkins and

22  petitioner to wait outside the bank until the Brinks truck arrived for a delivery.  Jenkins was

23  to approach the truck disguised as a woman, exchange a signal with the guard unloading

24  the truck, and point an unloaded gun at the guard.  Petitioner would then approach with a

25  gun, also unloaded, disarm the guard, take the money and drive Jenkins and himself away.

26  Jenkins and petitioner would then meet Valentine and divide the proceeds.  Petitioner

27  offered the use of the car that Felix had previously stolen as the getaway car.

28       Petitioner testified that on the morning of the planned robbery, he and Jenkins, who

1  was dressed as a woman, parked the stolen car near the bank.  When the Brinks truck

2  arrived, he and Jenkins waited on a nearby street.  As Spencer began to unload the truck,

3  Jenkins ran toward Spencer pointing a gun, and petitioner followed a few seconds later.

4  Spencer turned around, looked scared and shot his gun first.  As this was not part of the

5  plan, petitioner ran towards the getaway car and pulled out his gun.  Petitioner saw Jenkins

6  behind him, and when they were both in the car, petitioner drove off with Valentine

7  following.  He pulled over in a nearby race track, and petitioner and Jenkins got into

8  Valentine's car and drove away.  Valentine told them that he did not know what had gone

9  wrong.

10       Jenkins testified that prior to leaving for the robbery, Valentine gave him women's

11  clothing and a gun.  Jenkins saw real bullets in the clip of the gun, but none in the chamber.

12  This would require Jenkins to choke the gun manually in order to fire it.  Jenkins testified

13  that he did not own a gun or have experience shooting one.  Petitioner drove him to the

14  bank in the stolen getaway car, and they got out.  After the Brinks truck arrived and parked,

15  Spencer got out and looked at Jenkins.  Jenkins believed this was the signal for him to

16  approach.  He approached, pointing the gun at Spencer, and Spencer fired his gun at

17  Jenkins and missed.  Jenkins fired back using his right hand, even though he was left-

18  handed, without aiming.  He turned and ran to the getaway car, and he collided with a pole

19  and dropped the gun.  Petitioner drove them to the parking lot where they got into

20  Valentine's car.  Jenkins then fled to Washington state, where he stayed for five or six

21  months, and he was eventually arrested on a bus en route to Milwaukee.

22       Evidence was presented with respect to the Brinks employees on duty at the time of

23  the incident.  Narcisse, the driver, testified that he was scheduled to be the "messenger",

24  i.e. the employee who delivered the money from the truck to the bank.  However, he hurt

25  his back, so the dispatcher allowed him to be the driver and scheduled Warren Martin to be

26  the messenger.  The dispatcher then switched Martin to a different route and assigned

27  Spencer to be the messenger with Narcisse.  Martin testified that he had done the route to

28  the Berkeley bank with Narcisse in the past, and that he did not know petitioner or Jenkins

4

and was not involved in the plan to rob the truck.  Donna Smith was another Brinks employee who had previously done that route with Narcisse, and she also testified that she did not know petitioner or Jenkins and was not involved in the planned robbery.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in

**United States District Court**

For the Northern District of California

1   light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. 322 at

2   340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

3          When there is no reasoned opinion from the highest state court to consider the

4   petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,

5   501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th

6   Cir.2000).

7                                   **DISCUSSION**

8          Petitioner's remaining claims for habeas relief are as follows:  (1) the trial court's

9   denial of his motion for new counsel violated his right to effective assistance of counsel; (2)

10  his constitutional right to represent himself was violated; (3) his counsel was ineffective

11  because he (a) failed to prepare, (b) failed to object to prosecutorial misconduct, and (c)

12  opened the door to introduction of "other crimes" evidence; (4) his *Batson*[2] rights were

13  violated; (5) his counsel was ineffective in failing to object to the concession by counsel for

14  Jenkins that Jenkins and petitioner were guilty; (6) his due process rights were violated by

15  the trial court's failure to sever the trial against him from the trial against Jenkins; (7) his

16  due process rights were violated by prosecutorial misconduct in introducing propensity

17  evidence; (8) his counsel was ineffective in his handling of prosecution witness Jeanell

18  Ingram; (9) his right to a fair trial was violated by the trial court's failure to decide his motion

19  for a new trial; (10) his counsel was ineffective in that he violated the attorney-client

20  privilege and suborned perjury; (11) his due process rights were violated when the trial

21  court did not allow him to argue his motion for substitution of counsel; (12) his due process

22  rights were violated when the trial court gave an improper jury instruction; (13) his due

23  process rights were violated when the trial court instructed the jury that in order to find him

24  guilty of second-degree murder it first had to find that he had committed attempted grand

25  theft; (14) his rights against double jeopardy were violated when the trial court permitted a

26  retrial on a theory which had been rejected in the first trial; (15) his appellate counsel was

27  

28          [2] *Batson v. Kentucky*, 476 U.S. 79, 84 n.4 (1986).

1   ineffective; (16) his double jeopardy rights were violated by the prosecution's use of

2   carjacking charges which had been dismissed previously; (17) his Confrontation Clause

3   rights were violated when the trial court would not allow testimony of James Felix at a

4   motion hearing; and (18) his due process rights were violated when the state prevented his

5   access to James Felix.

6   **I.      Substitution of Counsel**

7         Petitioner claims that the trial court violated his Sixth Amendment right to counsel by

8   denying his motion, pursuant to *People v. Marsden*, 2 Cal. 3d 118 (1970), to substitute

9   appointed counsel, Marvin Levy.  Petitioner made the motion prior to trial and, after a

10  hearing, the trial court denied the motion.

11        The denial of a motion to substitute counsel implicates a defendant's Sixth

12  Amendment right to counsel and is properly considered in federal habeas.  *See Schell v.*

13  *Witek*, 218 F.3d 1017, 1024 (9th Cir. 2000) (en banc).  A criminal defendant who cannot

14  afford to retain counsel has no right to counsel of his own choosing.  *Wheat v. United*

15  *States*, 486 U.S. 153, 159 (1988).  Nor is he entitled to an attorney he likes and with whom

16  he feels comfortable.  *United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991).  The Sixth

17  Amendment guarantees effective assistance of counsel, not a "meaningful relationship"

18  between an accused and his counsel.  *Morris v. Slappy*, 461 U.S. 1, 14 (1983).   It is well

19  settled that when a defendant voices a seemingly substantial complaint about counsel, the

20  trial judge should make a thorough inquiry into the reasons for the defendant's

21  dissatisfaction, as was done in this case.  *Bland* at 1475-76.  The ultimate inquiry is

22  whether the petitioner's Sixth Amendment right to counsel was violated by the denial of the

23  substitution motion.  *Schell*, 218 F.3d at 1024-25.  On habeas review, the court must

24  determine whether the trial court's denial of the motion "actually violated [the petitioner's]

25  constitutional rights in that the conflict between [the petitioner] and his attorney had become

26  so great that it resulted in a total lack of communication or other significant impediment that

27  resulted in turn in an attorney-client relationship that fell short of that required by the Sixth

28  Amendment."  *Id.* at 1026.  To compel a criminal defendant to undergo a trial with the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  assistance of an attorney with whom he has become embroiled in "irreconcilable conflict" is,

2  in essence, to deprive the defendant of any counsel whatsoever.  *United States v. Moore*,

3  159 F.3d 1154, 1159-60 (9th Cir. 1998).

4       Here, there is no evidence in the record to show that petitioner and Levy had an

5  irreconcilable conflict.  Petitioner complains that Levy did not meet with him or call him

6  between July 2000 and the January 2001, except at court appearances.  Counsel explained

7  at the *Marsden* hearing that he had just spent a week reviewing and indexing the police

8  reports and other trial materials, that he discussed the case in depth with petitioner, and

9  that he would be prepared for trial.  The trial court then indicated that there was still another

10  week before jury selection would commence, and that the trial court proceedings would be

11  spread out, affording adequate time for Levy to be prepared.  Moreover, the record

12  indicates that Levy diligently advocated on his behalf at the pretrial hearings, filed various

13  pretrial motions including a motion to sever his case from Jenkins's, a motion challenging

14  the prosecutor's use of peremptory strikes, and successful motions to continue and to

15  prevent the prosecutor from re-charging petitioner with special circumstances allegations.

16  Levy also retained an investigator and opposed the prosecution's motion to introduce

17  evidence of prior bad acts.

18       Petitioner also complains that trial counsel failed to give him copies of the police

19  reports, which reports petitioner had seen prior to his previous trial.  Counsel explained,

20  however, that there were over 1000 pages of such reports that would have to be redacted,

21  and he indicated at the hearing that he would give petitioner copies of any specific reports

22  he wanted.  Petitioner also complains that they had disagreements about defense strategy,

23  that during one such disagreement Levy said that he did not want petitioner to give him any

24  more "bullshit," and that Levy did not take petitioner's *Marsden* motion seriously by

25  pretending in court that the motion would hurt his feelings.  While it appears they had

26  heated disagreement about defense strategy at times, it did not cause a complete

27  breakdown in communication, however, or other impediment to counsel's effective

28  representation.  To the contrary, the record shows that they continued to communicate

8

United States District Court

For the Northern District of California

1   about and discuss the case and their strategy.  In short, while petitioner felt that Levy did

2   not spend enough time preparing for his case, the record indicates that their relationship

3   not broken down.

4          In addition, as explained below, Levy's representation did not amount to ineffective

5   assistance of counsel, and the trial court specifically found his representation to be

6   adequate.  As there was no irreconcilable conflict or breakdown in the relationship between

7   petitioner and Levy, and Levy provided effective assistance of counsel, the denial of

8   petitioner's motion to substitute counsel did not deprive him of his Sixth Amendment right to

9   counsel.  Consequently, the state court's rejection of this claim was neither contrary to nor

10  an unreasonable application of federal law.

11         The court notes that petitioner has attached a declaration to his traverse in which he

12  makes factual allegations concerning his relationship with Levy and concerning Levy's

13  performance.  The AEDPA precludes this court from considering any additional facts that

14  he failed to present at his *Marsden* hearing in state court, at which he had the opportunity

15  to present facts about Levy's performance and about any problems in his relationship with

16  Levy.  *See* 28 U.S.C. § 2254(e)(2) (precluding federal habeas court from hearing new

17  evidence unless claim relies either on a new rule of constitutional law that the Supreme

18  Court has made retroactive to cases on collateral review, or a factual predicate that could

19  not have been previously discovered through the exercise of due diligence, and the facts

20  underlying the claim would be sufficient to establish by clear and convincing evidence that

21  but for constitutional error, no reasonable fact finder would have found the applicant guilty

22  of the underlying offense); *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999).

23  Petitioner has not established, or attempted to establish either of the narrow exceptions to

24  this rule.  Moreover, the court has reviewed the declaration and it largely duplicates the

25  allegations made in the petition and at the *Marsden* hearing in state court, which allegations

26  are addressed above and below in the discussion of petitioner's substitution of counsel and

27  ineffective assistance of counsel claims.

28

## II.    Self-Representation

Petitioner alleges that he requested to represent himself, and he complains that the

court summarily denied this request, in violation of his right to self-representation under

*Faretta v. California,* 422 U.S. 806 (1975*).*  After the trial court denied petitioner's *Marsden*

motion, the following exchange occurred:

> McDaniels: All right.  After this proceeding, is it possible that I go pro bono
> and self representation myself?
> The Court: We've already started now with him representing you.
> McDaniels: I understand that.  It's never too late to represent yourself.  I'd
> rather go pro bono.
> The Court: Here's what I want you to do.  They won't be back until 3:30.  I
> want you all to sit here and discuss things right here.  You can make a list of
> things you need and then we'll go from there.
> . . .
> The Court: Tell him [Levy] what you need and let's see if we can't work
> something out because I don't think you'd be very wise to be trying to
> represent yourself in this type of a case.
> McDaniels: Well, if I bring in a motion tomorrow, is it possible we could have a
> hearing on self representation or pro bono?
> The Court: What pro bono?
> McDaniels: I mean pro per.
> The Court: Pro per.  Yeah, I'm just saying it's not a very wise decision.  You
> can always ask for that.

(Resp. Ex. B at 15.)

The California Court of Appeal found that there was no violation of petitioner's right

to represent himself because he did not unequivocally request self-representation.  A

defendant's request for self-representation must be unequivocal, in addition to knowing,

voluntary, and timely.  *Faretta*, 422 U.S. at 832.  The state courts reasonably read

petitioner's questions as an inquiry into the *possibility* of self-representation, and not an

unequivocal motion to proceed pro se.  When petitioner stated that he wanted to proceed

pro se, the trial court instructed him to wait until later that day to raise the issue.  The trial

court could reasonably have surmised that petitioner might simply be reacting to the court

having just denied his motion for substitution of counsel.  Petitioner appeared to understand

that he had not in fact made an unequivocal motion to proceed pro se insofar as he

inquired about receiving a hearing "if I bring a motion tomorrow," which he never did.  Also,

the trial court did not rule that petitioner could not proceed pro se.  Rather, it simply warned

United States District Court

For the Northern District of California

1    petitioner that this would not be a wise course, and then informed him that he could request

2    to proceed pro se at any time and that the court would hold a hearing.  Under these

3    circumstances, the state courts reasonably found that petitioner did not make an

4    unequivocal request for self-representation, and thus that the trial court did not violate his

5    rights under *Faretta*.

6           Accordingly, petitioner is not entitled to habeas relief on this claim.

7    **III.    Ineffective Assistance of Trial Counsel**

8           Petitioner claims that his trial counsel, Marvin Levy, provided ineffective assistance,

9    in violation of his Sixth Amendment right to counsel.  Specifically, petitioner complains that

10   Levy failed to prepare for trial, failed to object to prosecutorial misconduct, and opened the

11   door to introduction of "other crimes" evidence.

12          A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

13   Sixth Amendment right to counsel, which guarantees not only assistance, but effective

14   assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to

15   prevail on a Sixth Amendment claim based on ineffectiveness of counsel, petitioner must

16   establish two distinct elements.  First, he must establish that counsel's performance was

17   deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing

18   professional norms.  *Id.* at 688.  The relevant inquiry is not what defense counsel could

19   have presented, but rather whether the choices made by defense counsel were

20   reasonable.  *Babbitt v. Calderon*, 151 F.3d at 1173.  Second, he must establish that he was

21   prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability

22   that, but for counsel's unprofessional errors, the result of the proceeding would have been

23   different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to

24   undermine confidence in the outcome.  *Id.*  A court need not determine whether counsel's

25   performance was deficient before examining the prejudice suffered by the defendant as a

26   result of the alleged deficiencies.  *Id.* at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 &

27   n.3 (9th Cir. 1995) (noting with approval district court's refusal to consider whether

28   counsel's conduct was deficient after determining petitioner could not establish prejudice).

a.   <u>Trial Preparation</u>

Petitioner complains that Levy did not adequately prepare for trial.  Petitioner alleges that after Levy's appointment, he did not speak to petitioner or return petitioner's phone calls for approximately six months, until shortly before trial.  Petitioner further alleges that Levy did not obtain recorded witness statements until just before trial, did not obtain a transcript of the first trial, and did not obtain discovery regarding the carjacking incident or regarding any money that might have been paid to prosecution witnesses.

Even assuming these allegations are true, petitioner has not identified or demonstrated any prejudice.  He does not, for example, indicate what he would have told Levy had Levy spoken to him more frequently prior to trial.  He also does not  identify what particular evidence, if any, Levy missed by not obtaining discovery sooner, much less demonstrate how such evidence would have helped the defense or that there is a reasonable probability that it would have altered the outcome of the trial.

Petitioner identifies only one specific piece of information that Levy failed to discover.  Petitioner faults Levy for failing to discover prior to trial that Valentine, the man whom petitioner and Jenkins claimed had orchestrated the robbery, had died in 1996.  The California Court of Appeal explained why the evidence of Valentine's death had little impact on the verdict, and thus why Levy's failure to discover it earlier was not prejudicial:

> McDaniels contends Levy's failure to discover that a person named Frank Valentine had died gave the prosecutor an advantage while cross-examining defense witnesses.  The defense theory was that Valentine had persuaded Jenkins and McDaniels to participate in the Brinks robbery by telling them a Brinks guard and a bank employee were in on the plan, and the money would be handed over without resistance.  Jenkins' mother, Linda Armour, testified for the defense.  On cross-examination, the prosecutor asked Armour about threatening phone calls she had received over the years since her son became a suspect in the Brinks incident.  Armour said she had assumed Frank Valentine was the person making the calls, and the voice on the calls sounded like the same person each time.  Armour testified she received these calls in 1994 afer the incident, a couple of times in 1995, once in 1996, and again in 1997 before she moved to Vacaville.
>
> At the end of Armour's cross-examination, Levy said: "I'm asking for a recess, your Honor.  We just received some discovery that we've not seen before and we need to deal with it."  Out of the presence of the jury, Levy told the court that just before Armour took the stand, the prosecutor handed the defense a copy of a death certificate showing Valentine had died in August 1996.  DuBois said Armour was actually on the stand when he got the

certificate.  After the recess. Levy rehabilitated Armour by questioning her about the certificate, establishing that she had not known about Valentine's death and had never been sure the threatening phone calls were all from the same person.  Armour stated that was why she had consistently responded to the prosecutor's questioning by saying the voice "sounded like" Valentine.

We discern no significant prejudice to the defense from this incident. The threatening phone calls were not a critical part of Armour's testimony. They were explored only on cross-examination.  Armour's identification of Valentine as the maker of the calls was consistently hedged by explanations that she merely assumed it was him and that it sounded like his voice.  Thus, her ignorance of the fact that Valentine had died in 1996 had only a minor impact on her credibility.  There is no reasonable probability that McDaniels would have enjoyed a better result had Levy been aware of Valentine's death.

(Resp. Ex. B at 16-17.)

Petitioner argues that the evidence of Valentine's death in 1996 would have impeached Armour's credibility because it would have established that Valentine could not, contrary to Armour's testimony, have made the threatening calls to her.  The evidence that Valentine had died in 1996 had only a minor impact on Armour's credibility because Armour testified only that the voice sounded like Valentine's, not that it was Valentine.  Further, any impeachment value had virtually no impact on the outcome of the trial. Armour, Jenkins's mother, was a minor witness, and not one of the eyewitnesses to the incident.  She simply corroborated Jenkins's account that Valentine planned the incident and that nobody was supposed to get hurt.  The purpose of Armour's testimony was not to introduce evidence of the threatening phone calls; indeed, she did not testify about the calls at all on direct examination.  Accordingly, the California Court of Appeal reasonably concluded that there is no reasonable likelihood that Levy's failure to discover this evidence sooner affected the verdict.

b.     Prosecutorial Conduct

Petitioner also claims that Levy was ineffective in failing to move for a mistrial based on prosecutorial "misconduct."  Petitioner points to the prosecutor questioning Jenkins why he did not look for Valentine prior to trial and questioning Armour about the threatening phone calls.  Petitioner argues that these questions were improper because the prosecutor knew that Valentine had been dead since 1996.

13

United States District Court

For the Northern District of California

1    Levy's failure to move for a mistrial on the basis of prosecutorial misconduct was

2  neither ineffective nor prejudicial because such a motion would have been meritless.  *See*

3  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (holding that trial counsel cannot

4  have been ineffective for failing to raise a meritless motion); *see also Knowles v.*

5  *Mirzayance*, No. 07-1315, slip op. 1, 11, 14-15 (U.S. 2009) (finding that the United States

6  Supreme Court has never required defense counsel to pursue every nonfrivolous claim

7  regardless of its merit, viability, or realistic chance of success).  There was nothing

8  improper about the question to Jenkins because Valentine's death did not preclude Jenkins

9  or his attorney looking for him and discovering that he was dead -- or looking for him and

10  interviewing him prior to his death.  The prosecutor did not argue to the jury that Jenkins or

11  petitioner were at fault for not investigating Valentine or for not calling him as a witness.

12  Indeed, the prosecutor later erased any questions the jury might have had as to why the

13  defense did not call Valentine as a witness when the prosecutor introduced the evidence

14  that Valentine was dead.  In addition, when the prosecutor questioned Armour about the

15  threatening phone calls, including some that had occurred after Valentine's death, the

16  prosecutor did not in any way suggest to Armour that she identify Valentine as the caller.

17  Moreover, Armour only said the caller sounded like Valentine, and, as discussed above, the

18  prejudice to petitioner's case from such testimony was minimal.  Consequently, Levy's

19  failing to move for a mistrial based on prosecutorial misconduct did not amount to

20  ineffective assistance of counsel.

21          c.    Evidence of Prior Bad Acts

22    Petitioner claims that Levy was ineffective because he questioned petitioner about

23  him and Jenkins having regularly sold drugs on the street.  Petitioner objects to the

24  prejudicial nature of this evidence, and because it opened the door for the prosecutor's

25  questioning petitioner about his prior arrests for drug sales, possession of a loaded firearm,

26  and supplying the police with false information.

27    The California Court of Appeal rejected petitioner's claim based on the following

28  reasoning:

1

2

3

4

5

> [E]ven when defense counsel elicits evidence adverse to his client an appellate court must be reluctant to second-guess counsel when a tactical choice led to the damaging testimony.[ ] Here, Levy's strategy, made explicit in his closing argument, was to portray McDaniels as a gullible young man, "selling drugs and just getting along," taken in by Valentine's promise that the staged robbery would yield easy money. We cannot say this tactic amounted to ineffective assistance of counsel. Levy could reasonably have deemed the prejudicial impact of the prior arrests to have been minimal, given his client's admitted participation in the Brinks incident.

6 (Resp. Ex. B at 17-18 (citations omitted).)

7        The record demonstrates that Levy had a tactical reason for introducing the

8 evidence that petitioner and Jenkins sold drugs on the street. As described by the

9 California Court of Appeal, in closing argument, he portrayed petitioner as a young, low-

10 level drug dealer who would believe Valentine's assertion that the robbery would yield easy

11 money, who would be afraid of Valentine's retribution, as Jenkins had testified, if he did not

12 follow through with Valentine's plan, and who did not have the sophistication or background

13 to plan and execute a Brinks heist and murder. Where there is indicia on the record that a

14 decision by trial counsel was based upon tactical reflection, the decision is afforded a

15 strong presumption that it falls within the wide range of reasonable professional assistance.

16 *Strickland*, 466 U.S. at 689; *see also United States v. Palomba*, 31 F.3d 1456, 1466 (9th

17 Cir. 1994) (presumption of sound trial strategy not applicable where indicia of tactical

18 reflection by counsel on issue absent from record). Here, the presumption of reasonable

19 professional assistance applies because Levy's closing argument indicates that his

20 decision to open the door to petitioner's minor criminal history and drug sales was based

21 upon tactical reflection and was part of a defense strategy. In addition, as the California

22 Court of Appeal correctly pointed out, petitioner  admitted to the jury that he participated in

23 holding up a Brinks truck at gunpoint, which led to the murder of one man. In this context,

24 the prejudicial effect of his participation in more minor crimes would be significantly

25 diminished.

26        In sum, the state courts' denial of petitioner's claim of ineffective assistance of

27

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   counsel was neither contrary to nor an unreasonable application of federal law.[3]   Petitioner

2   is not entitled to habeas relief on this claim.

3   **IV.     Jury Selection**

4        Petitioner claims that the prosecutor used peremptory challenges to strike three

5   African-American prospective jurors based on their race, in violation of the Equal Protection

6   Clause.

7        The Equal Protection Clause forbids the challenging of potential jurors solely on

8   account of their race.  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  A party may raise an

9   equal protection claim on behalf of a juror excluded because of the juror's race, regardless

10  of whether the party and the excluded juror share the same race.  *Powers v. Ohio*, 499 U.S.

11  400, 406 (1991).  A violation of equal protection under *Batson* is established in a three-step

12  process: (1) the defendant must make out a prima facie case that the prosecutor exercised

13  peremptory challenges on the basis of race (or gender) "by showing that the totality of the

14  relevant facts gives rise to an inference of discriminatory purpose;" (2) if the prima facie

15  case is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for

16  striking the jurors in question; and (3) if the prosecutor carries the burden of showing a

17  race-neutral explanation, the defendant has the burden to prove purposeful discrimination.

18  *Batson*, 476 U.S. at 93-94, 97-98.

19       Here, the trial court found a prima facie case of discrimination under the first step of

20  the *Batson* analysis and proceeded to the second and third steps in which the prosecutor

21  offered race neutral reasons and the trial court found no intentional discrimination. (*See*

22  Resp. Ex. B at 3-5.) "Once a prosecutor has offered a race-neutral explanation for the

23  peremptory challenges and the trial court has ruled on the ultimate question of intentional

24  discrimination, the preliminary issue of whether the defendant has made a prima facie

25  showing becomes moot." *Hernandez*, 500 U.S. at 359.  As a result, this court need not

26  _____

27       [3]The declaration of George Young, another prisoner, attached to Petitioner's
    traverse, asserting that Levy provided ineffective assistance to Young in an unrelated case,
28  does not, even if true, alter this conclusion.

United States District Court

For the Northern District of California

dwell on the first step of *Batson*, but may proceed to the second and third steps.

Petitioner challenges the state courts' findings that the prosecutor satisfied his burden of articulating race-neutral explanations for challenging the prospective jurors, and that petitioner did not carry his burden to prove purposeful discrimination.

At *Batson's* second stage, the prosecutor's explanation need not be persuasive; unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Purkett v. Elem*, 514 U.S. 765, 768-69 (1995). In evaluating the race neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause, *Hernandez*, 500 U.S. 355-62, and that the persuasiveness of the prosecutor's non-discriminatory intent does not become relevant until the third step, *Purkett*, 514 U.S. at 768-69. A prosecutor must "state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Miller-El v. Dretke*, 545 U.S. 231, 250-52 (2005).

As summarized by the California Court of Appeal, the prosecutor supplied the following reasons for challenging the three prospective jurors at issue:[4]

> Mr. W., whose brother had been an Oakland policeman, believed that policemen plant evidence. Mr. W. himself had been a victim of police brutality. Furthermore, during a break the prosecutor observed Juror W. Staring at the area behind the court reporter with a weird look on his face, which made the prosecutor uneasy.

> Ms. A., who the prosecutor noted did not appear to be African-American but had listed that race among others on her questionnaire, seemed hesitant and intimidated on voir dire, and did not seem to fully comprehend the situation.

> Mr. R., during a break, had an interaction with the prosecutor that left the prosecutor feeling uncomfortable. The prosecutor explained, "being an African-American prosecutor we get used to certain looks, and Mr. R. Gave me a look and he looked me up and down as if how could I actually be a district attorney or how could I actually, it was just a weird interaction in that he looked at me from head to toe and kind of had a little I wouldn't say smirk but that uneasy feeling where we know that it wasn't. [Sic.]" The prosecutor

---

[4]The trial court found that there was a prima facie case of discrimination with respect to the prosecutor's challenging seven African-American prospective jurors, and the prosecutor offered his reasons for challenging each of them. Here, as on direct appeal, petitioner challenges the exclusion of only three of these prospective jurors: Mr. W, Ms. A, and Mr. R.

United States District Court

For the Northern District of California

1

2

also observed that when asked whether he would be able to convict if he
were sympathetic toward the defendants, Mr. R. had hesitated.  The
prosecutor noted this was an important issue for him, because a sympathetic
juror had made the deliberations very difficult at the first trial.

3

(Resp. Ex. B at 3-5.)

4

5

        The reasons offered by the prosecutor for challenging the prospective jurors are, on

6

their face, race-neutral.  Mr. W. distrusted police officers, had been a victim of police

7

brutality, and gave the prosecutor a "weird" look that made the prosecutor "uneasy."  (Resp.

8

Ex. I at 338-39.)  Ms. A was tentative in that she had to be prompted to speak into the

9

microphone, and she stated that she did not understand that defendants are presumed

10

innocent.  (Resp. Ex. B at 6.)  The prosecutor's discomfort with Mr. R stemmed from a

11

"smirk" Mr. R. gave him during a recess which suggested to the prosecutor that Mr. R.

12

believed that the prosecutor, as an African-American, could not be a prosecutor; also, Mr.

13

R. had hesitated when asked if he were sympathetic toward the defendant.  (Resp. Ex. I at

14

342-43.)  These reasons are race-neutral in that they do not involve race nor are they

15

inherently discriminatory.  *See*, *e.g.*, *Purkett*, 514 U.S. at 768-69 (prosecutor's explanation

16

that he struck black juror because he had long, unkempt hair, mustache and beard was

17

race-neutral and satisfied second step); *United States v. Steele*, 298 F.3d 906, 913-14 (9th

18

Cir. 2002) (challenging jurors based on their opinions of the criminal justice system is race

19

neutral, even where the opinion is that the system is racist).  As a consequence, the state

20

courts reasonably found that the prosecutor satisfied *Batson*'s second step of proffering

21

race-neutral explanations for his challenges.

22

        The state courts were also reasonable in finding that the prosecutor had not

23

engaged in purposeful discrimination at *Batson*'s third stage.  To fulfill its duty at *Batson*'s

24

third step,  the trial court must evaluate the prosecutor's proffered reasons and credibility

25

under the totality of the relevant facts, using all the available tools including its own

26

observations and the assistance of counsel.  *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir.

27

2004).

28

At that stage, implausible or fantastic justifications may (and probably will) be
found to be pretexts for purposeful discrimination.  But to say that a trial judge

18

United States District Court

For the Northern District of California

1    may choose to disbelieve a silly or superstitious reason at step three is quite
2    different from saying that a trial judge must terminate the inquiry at step two
     when the race-neutral reason is silly or superstitious.  The latter violates the
3    principle that the ultimate burden of persuasion regarding racial motivation
     rests with, and never shifts from, the opponent of the strike.

4    *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (emphasis added).

5        A finding of discriminatory intent turns largely on the trial court's evaluation of the

6    prosecutor's credibility.  *Rice v. Collins*, 546 U.S. 333, 340-41 (2006).  Because

7    determinations of credibility and demeanor of the prosecutor and jurors lie "peculiarly within

8    the trial judge's province," the trial court's ruling on the issue of discriminatory intent must

9    be sustained unless clearly erroneous.  *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208-11

10   (2008).  On habeas review, the findings of the state trial court on the issue of discriminatory

11   intent, including the trial court's evaluation of the prosecutor's credibility, are findings of fact

12   entitled to deference.  *Purkett*, 514 U.S. at 769.  So are the findings of the state appellate

13   court.  *Mitleider*, 391 F.3d at 1050.  Under AEDPA, therefore, a federal habeas court can

14   only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral

15   explanations for the *Batson* challenge."  *Rice*, 546 U.S. at 338 (citing 28 U.S.C. §

16   224(d)(2)).  This standard is demanding, though not insatiable.  *Miller-El*, 545 U.S. at 240.

17   The court addresses the state courts' findings of no purposeful discrimination with respect

18   to each juror, in turn.

19       Mr. W. expressed distrust of police officers and described past experience as a

20   victim of police brutality.  (Resp. Ex. I at 377-82.)  These answers could indicate that Mr. W.

21   might be biased against prosecution witnesses or not regard police testimony fairly.  As for

22   Ms. A, her confusion about the presumption of innocence, a basic and fundamental

23   concept at trial, could reasonably indicate that she might not be able to apply the law

24   correctly.  (Resp. Ex. B at 6.)  As for Mr. R., the trial court's finding that he hesitated before

25   he answered whether he would sympathize with the defendant is a factual finding entitled

26   to deference on habeas review under 28 U.S.C. § 2254(d)(2), and petitioner has not

27   indicated why such a finding could not reasonably be supported by the record.  *See*

28   *Purkett*, 514 U.S. at 769*; Mitleider*, 391 F.3d at 1050.  Such a hesitation could reasonably

United States District Court

For the Northern District of California

1   suggest that there was a risk that Mr. R. might be biased towards the defense.  Similarly,

2   petitioner points to nothing in the record to suggest why the prosecutor's account of Mr. R.

3   looking at him as though he believed that he could not be a prosecutor was not credible.

4   Based on the foregoing record, the trial court could reasonably find that the prosecutor's

5   race-neutral explanations for challenging the three prospective jurors were credible and

6   that he did not have any discriminatory intent.

7        Petitioner contends that only African-American potential jurors were asked whether

8   they were sympathetic to the defendant and if this would prevent them from convicting him.

9   Comparative juror analysis -- i.e., determining whether non-challenged jurors possess any

10  of the characteristics on which the prosecution challenged jurors in the protected group --

11  may tend to prove discrimination at the third *Batson* step.  *Snyder*, 128 S. Ct. at 1212.

12  (2008)   Contrary to the view of the California courts, comparative juror analysis should take

13  place on appeal even when the trial court did not engage in such analysis.  *Boyd, 467 F.3d*

14  *at* 1148-50.  Here, however, the record does not support petitioner's contention.  At least

15  six other jurors, who were not African-American, were also asked whether they could

16  convict even if they felt sympathy for the defendant.  (Resp. Ex. B at 6.)  Thus, a

17  comparative juror analysis does not uncover any discriminatory intent in the prosecutor's

18  challenges to the prospective jurors.

19       As the state courts reasonably found no discriminatory intent in the prosecutor's

20  challenges to the three prospective jurors, petitioner is not entitled to habeas relief on his

21  *Batson* claim.

22  **V.     Failure to Object to Opening Argument by Co-defendant's Counsel**

23       Petitioner claims that his attorney was ineffective because he failed to object to

24  opening argument by Jenkins's attorney that Jenkins was only guilty of lesser offenses than

25  murder.  Specifically, Jenkins's counsel argued that Jenkins was not guilty of felony murder

26  or first-degree murder, but rather simply of grand theft and a lesser homicide.  (Resp. Ex. F

27

28

United States District Court

For the Northern District of California

at 398-405.)[5]

Petitioner's counsel was not ineffective in failing to object to this argument because it was entirely consistent with petitioner's own testimony and defense theory.  Petitioner (and Jenkins) claimed to have been duped into participating in the Brinks scheme, and they admitted that they had held up the Brinks guard and Jenkins shot him.  Petitioner's counsel advanced the defense theory that this only warranted guilty verdicts for the lesser offenses of grand theft and voluntary manslaughter, and not robbery and murder.  As described above, counsel's performance is deficient under the Sixth Amendment only if it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. 668, 686.   There would have been no reasonable basis for petitioner's counsel to object to argument by Jenkins's counsel that supported petitioner's own defense theory.  Consequently, counsel's failure to make such an objection did not deprive petitioner of effective assistance of counsel.

Petitioner is not entitled to habeas relief on this claim.

## VI.   Severance

Petitioner claims that the trial court's failure to sever his case from that against his co-defendant violated due process.[6]  A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  In addition, the failure to sever must have had a substantial and injurious effect or influence in determining the jury's verdict.  *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

At trial, after Jenkins's motion to replace his attorney was denied, petitioner's counsel moved for severance on the grounds that the disagreement between Jenkins and Jenkins's attorney was prejudicial to petitioner.  (Resp. Ex. F at 354.)  Trial counsel did not explain how any conflict between Jenkins and Jenkins's attorney affected petitioner, let

---

[5]Jenkins himself objected to this argument by his own attorney, but the objection was overruled.  (*Id.*)

[6]Petitioner advances this argument in sections "VI" and "VIa" of his petition.

United States District Court

For the Northern District of California

1   alone how it might have prejudiced him.  The trial court denied the motion.  (*Id.*)

2   Petitioner does not explain here how he might have been prejudiced from Jenkins's

3   alleged conflict with counsel, nor is there any indication of such prejudice in the record.

4   Rather, petitioner argues that he was prejudiced by the argument by Jenkins's attorney,

5   described above, that Jenkins was guilty of lesser offenses.  As described above, this

6   argument was entirely consistent with petitioner's own testimony and defense theory that

7   while he was involved in the incident, he did not plan to rob or kill the Brinks guard.  This

8   was not a case in which petitioner's co-defendant advanced a defense theory that was

9   irreconcilable, or even inconsistent with his own.  *Cf. United States v. Throckmorton*, 87

10  F.3d 1069, 1072 (9th Cir. 1996) (severance warranted where defendant "shows that the

11  core of the co-defendant's defense is so irreconcilable with the core of his own defense that

12  the acceptance of the co-defendant's theory by the jury precludes acquittal of the

13  defendant.").  As there is no indication of prejudice from the failure to sever petitioner's trial

14  such failure was not prejudicial and did not violate due process.

15  Petitioner is not entitled to habeas relief on this claim.

16  **VII.    Prosecutor's Introduction of Evidence of Prior Bad Acts**

17  Petitioner claims that the prosecutor committed misconduct, in violation of due

18  process, by introducing evidence of petitioner's prior arrests.  Petitioner testified that he

19  was a low-level street "hustler" who sold small amounts of marijuana, but not cocaine, as

20  part of his explanation for how he was duped and intimidated by Valentine.  (Resp. Ex. F at

21  1758-63.)  He testified that he did not use drugs, and did not sell cocaine.  (*Id.* at 1763,

22  1826-27.)  On cross-examination, the prosecutor questioned petitioner about his past

23  arrests for possession of crack cocaine, which petitioner acknowledged.  (*Id.* at 1826-29.)

24  Defense counsel's objection to the evidence of the past arrests was overruled, and the trial

25  court denied a motion for mistrial, finding that the evidence was proper impeachment

26  evidence.  (*Id.* at 1846.)

27  A defendant's due process rights are violated when a prosecutor's misconduct

28  renders a trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

United States District Court

For the Northern District of California

1  Similarly, the admission of evidence violates due process if it was arbitrary or so prejudicial

2  that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th

3  Cir. 1995).  Only if there are no permissible inferences that the jury may draw from the

4  evidence can its admission violate due process, however.  *Jammal v. Van de Kamp*, 926

5  F.2d 918, 919 (9th Cir. 1991).  Petitioner argues that the evidence of his prior arrests was

6  subject to the impermissible inference that he had a propensity to commit the charged

7  crimes.  However, because the evidence of petitioner's arrests for possessing crack

8  cocaine contradicted his testimony that he had not used or sold cocaine, the evidence had

9  a permissible, impeachment purpose.  As such, the jury could draw the permissible

10  inference from the evidence that petitioner was not a credible witness.  As petitioner's prior

11  arrests were proper pieces of impeachment evidence, the prosecutor's introduction of such

12  evidence, and its admission by the trial court, did not render the trial fundamentally unfair in

13  violation of due process.

14       Petitioner is not entitled to habeas relief on this claim.

15  **VIII.   Witness Jeanell Ingram**

16       Petitioner makes four claims arising out of the testimony of prosecution witness

17  Jeanell Ingram, petitioner's aunt, about an interview between her and petitioner's counsel,

18  Marvin Levy.[7]

19       a.   Background

20       Out of the presence of the jury, the prosecutor made an offer of proof in which he

21  stated that Ingram would testify that during her interview with Levy, Levy said that petitioner

22  wanted to speak to Ingram to ask her to change her testimony.  (Resp. Ex. F at 2429.)

23  Over Levy's objection, the trial court allowed the prosecutor to examine Ingram on this

24  subject, and denied Levy's motion for a mistrial.  (*Id.* at 2429-30.)  The prosecutor

25  examined Ingram in front of the jury about the interview, and she testified that Levy and an

26  investigator came to her home prior to trial.  (*Id.* at 2450.)  She told them that she knew that

27  ───────────────

28       [7]As these claims all concern trial counsel's interview of Ingram, the court discusses
them together.  The claims are listed above as claims 8, 10, 11 and 15.

United States District Court
For the Northern District of California

1   petitioner wanted to see her, but that it was difficult for her to speak with him.  (*Id.* at 2450-

2   51.)  She testified that Levy then said to her that petitioner wanted her to change her

3   testimony.  (*Id.* at 2451.)  She said that she knew that and could not do it, and that there

4   was no discussion of what petitioner wanted her to say.  (*Id.*)  Levy's continued objections

5   and renewed motion for a mistrial were denied.

6        On cross-examination by Levy and Jenkins's counsel, Ingram explained that prior to

7   Levy's visit, she had believed that petitioner wanted her to change her testimony so she

8   refused to answer his phone calls to her.  (*Id.* at 2469.)  She further explained that when

9   Levy told her during their interview, Levy simply wanted to know what petitioner had said to

10  her on the night of the robbery. (*Id.* at 2538.)  She testified that when Levy said that

11  petitioner wanted her to change her testimony, Levy was only "joking," and she admitted

12  that she would not know if petitioner had ever asked Levy to visit her or ask her anything.

13  (*Id.* at 2469-70, 2538.)  She further testified that Levy said almost everything in a joking

14  manner, and that he was probably trying to relax her and make it easier for her to talk.  (*Id.*

15  at 2538.)  Ingram further explained that Levy showed concern regarding her family, and  did

16  not joke about that.  (*Id.* at 2543-44*.)*  She testified that she did not think that he was

17  actually asking her to change her testimony, and that he never asked her to lie for

18  petitioner.  (*Id.* at 2538, 2546.)

19       Levy's investigator then testified about the interview.  She testified that Levy was

20  generally jocular, that she did not recall him telling Ingram that petitioner wanted her to

21  change her testimony, and that if he did say such a thing it would have been in jest.  (*Id.* at

22  2551.)  She testified that in over 25 interviews she had done with him, Levy had never

23  asked a witness to change his or her testimony, nor had she even known him to do so, and

24  that they had interviewed Ingram about what occurred the night of the incident.  (*Id.* at

25  2552, 2556-60.)

26       b.   <u>Ineffective Assistance of Counsel</u>

27       Petitioner argues that Levy's interview of Ingram constituted ineffective assistance of

28  counsel because Levy violated the attorney-client privilege and suborned perjury in his

United States District Court
For the Northern District of California

1   interview of Ingram.  To establish ineffective assistance of counsel, a petitioner must

2   demonstrate that counsel's performance was deficient, *i.e.*, that it fell below an "objective

3   standard of reasonableness" under prevailing professional norms.   *Strickland*, 466 U.S. at

4   688.

5           It was entirely reasonable for Levy to investigate and interview Ingram, as she was a

6   witness to whom petitioner had admitted that he participated in the crimes on the night of

7   their commission.  When Levy told Ingram that petitioner wanted her to change her

8   testimony, he did not suborn perjury.  The evidence was undisputed that Levy was joking,

9   and that Ingram testified that she did not think that Levy wanted her to change her

10  testimony.  Ingram's testimony in this regard was corroborated by Levy's investigator, who

11  also characterized any statement by Levy to Ingram as a joke and not an effort to change

12  her testimony.  Levy's joking statement also did not disclose any privileged attorney-client

13  communications insofar as petitioner does not contend that he and Levy ever discussed

14  requesting that Ingram change her testimony.  Indeed, in his traverse, petitioner asserts

15  that he did not tell Levy to contact Ingram.

16          In addition, the record is clear that Levy was far from complacent about the

17  introduction of Ingram's testimony.  He argued vigorously against the admission of her

18  testimony on several occasions, made multiple motions for a mistrial, and ultimately, when

19  that failed, he effectively neutralized her testimony by eliciting the fact that Ingram knew he

20  was joking and did not believe he was asking her to change her testimony.  Based upon

21  this record, Levy could not be characterized as having performed deficiently on behalf of

22  petitioner in his handling of Ingram.

23          Moreover, petitioner was not prejudiced by Ingram's testimony about her interview

24  with Levy.  In order to show prejudice from counsel's performance, a petitioner must

25  establish that "there is a reasonable probability that, but for counsel's unprofessional errors,

26  the result of the proceeding would have been different."  *Id.* at 694.  There was very strong

27  evidence of petitioner's guilt in this case: he admitted at trial that he participated in the

28  crimes, he was identified as being involved in stealing the getaway car several days before

United States District Court

For the Northern District of California

1    the incident, his hand print was found inside the car, and he fled the area after the incident

2    occurred.   In light of such evidence, it is unlikely that the guilty verdict rested at all on any

3    inference the jury might have drawn from Ingram's testimony that Levy had jokingly told her

4    that petitioner wanted her to change her testimony.  Even if the jury had believed that

5    petitioner in fact wanted Ingram to change her testimony against him, which would hardly

6    be surprising considering that it was not favorable to petitioner, such evidence would have

7    been a relatively minor addition to the already strong case against petitioner.  Thus any

8    deficiency by Levy in joking to Ingram that petitioner wanted her to change her testimony

9    was not likely to have made a difference in the outcome of the trial.

10                    c.    Petitioner's second *Marsden* motion

11            Petitioner claims that his due process rights were violated when the trial court did not

12   allow him to argue a second motion for substitution of counsel, raised during the

13   discussions of Ingram's testimony.  The record indicates, however, that petitioner was

14   allowed to argue the motion.  (Resp. Ex. F at 2462-63.)  Specifically, he argued to the trial

15   court that he wanted to substitute counsel based on Levy's saying to Ingram that petitioner

16   wanted her to change her testimony.  (*Id.*)  The trial court, having just engaged in extensive

17   discussions about Levy's statement to Ingram, including hearing offers of proof regarding

18   those statements, denied the motion, and then denied further argument about the motion.

19   (*Id.* at 2463-64.)  Petitioner cites to no authority, and the Court is aware of none, providing

20   that due process required the trial court to allow him more argument.

21            Moreover, the denial of petitioner's *Marsden* motion did not violate petitioner's Sixth

22   Amendment right to counsel.  As described in greater detail above, the ultimate inquiry in

23   determining whether a petitioner's Sixth Amendment right to counsel was violated by the

24   denial of the substitution motion is whether the trial court's denial of the motion "actually

25   violated [the petitioner's] constitutional rights in that the conflict between [the petitioner] and

26   his attorney had become so great that it resulted in a total lack of communication or other

27   significant impediment that resulted in turn in an attorney-client relationship that fell short of

28   that required by the Sixth Amendment."  *Schell*, 218 F.3d at 1026.  The trial court denied

United States District Court

For the Northern District of California

1   the motion, initially finding that Levy's representation had been effective and noting that trial

2   was nearly over, and later finding that Levy and petitioner appeared to be communicating

3   and working effectively together.  (Resp. Ex. F at 2463-64, 2564.)  For the reasons

4   discussed above, Levy's joking statement to Ingram did not disclose any communication

5   between Levy and petitioner, suborn perjury, or amount to ineffective assistance of

6   counsel.  Moreover, Levy and petitioner continued to confer throughout the discussions of

7   Ingram's testimony, Levy continued to advocate vigorously on behalf of petitioner to block

8   Ingram's testimony, and Levy assisted petitioner in communicating his *Marsden* motion to

9   the court.  As the record does not reflect anything approaching "total lack of

10  communication" between petitioner and Levy or another similar breakdown in their

11  relationship, the trial court did not violate petitioner's Sixth Amendment rights in denying his

12  second *Marsden* motion.

13          d.      Ineffective Assistance of Appellate Counsel

14          Petitioner claims that he received ineffective assistance from his appellate counsel

15  because appellate counsel failed to raise the foregoing claim challenging the denial of his

16  second *Marsden* motion.  The Due Process Clause of the Fourteenth Amendment

17  guarantees a criminal defendant the effective assistance of counsel on his first appeal.

18  *Evitts v. Lucey*, 469 U.S. 387 (1985).  In evaluating such a claim, the federal court applies

19  the standard set forth in *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  In the

20  instant case, appellate counsel raised four claims on direct appeal: that the denial of

21  petitioner's prior *Marsden* motion and his motion to proceed pro se were improper, that

22  counsel was ineffective, and that jury selection violated petitioner's rights.  Although

23  appellate counsel did not raise petitioner's second *Marsden* claim discussed herein, such a

24  claim, for the reasons discussed above, is without merit.  An appellate lawyer's failure to

25  raise a meritless claim is neither unreasonable nor prejudicial.  *Miller v. Keeney*, 882 F.2d

26  1428, 1434 (9th Cir. 1989) (noting that one of "hallmarks of effective appellate advocacy" is

27  weeding out weaker issues); *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding

28  appellate counsel has no duty to raise every nonfrivolous claim requested by appellant).

**United States District Court**

For the Northern District of California

1  Accordingly, petitioner did not receive ineffective assistance of appellate counsel nor was

2  he prejudiced by the manner in which his appeal was conducted.

3  **IX.    New Trial Motion**

4          Petitioner claims that the trial court violated his right to due process by failing to

5  decide his motion for a new trial.  Petitioner's claim is contradicted by the record.  The

6  record clearly indicates that the trial court denied his motions for a new trial.  (Resp. Ex. F,

7  Vol. 18, Transcript of 6/22/01, at 3-12.)   Accordingly, habeas relief is not available on this

8  claim.

9  **X.    Jury Instructions**

10         Petitioner argues that the trial court violated his right to due process by giving an

11  erroneous instruction on aider and abettor liability for second degree murder.[8]

12         To obtain federal collateral relief for errors in the jury charge, a petitioner must show

13  that the ailing instruction by itself so infected the entire trial that the resulting conviction

14  violates due process.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  The instruction may

15  not be judged in artificial isolation, but must be considered in the context of the instructions

16  as a whole and the trial record.  *Id.* at 72.  In other words, the court must evaluate jury

17  instructions in the context of the overall charge to the jury as a component of the entire trial

18  process.  *United States v. Frady*, 456 U.S. 152, 169 (1982).  A habeas petitioner is not

19  entitled to relief unless the instructional error caused "actual prejudice," meaning it "had

20  substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

21  *Abrahamson*, 507 U.S. 619, 637 (1993).

22         The trial court instructed the jury pursuant to CALJIC No. 3.02 that if a person who

23  aids and abets another in committing a crime, the person is not only liable for that crime,

24  called the "target crime", but also for any other offense committed as a natural and

25  probable consequence of the target crime.  *See People v. Prettyman*, 14 Cal. 4th 248, 254

26  (1996).  California law required the court to identify and describe for the jury each potential

27

28         [8]This argument is set forth in claims 12 and 13, listed above.

28

United States District Court

For the Northern District of California

1    target offense supported by the evidence. *See id.* at 268-70.  The trial court instructed the

2    jury that the only target felony that would support petitioner's liability for first-degree murder

3    would be robbery.  The trial court further instructed the jury instructed that the only target

4    offense that would support petitioner's liability for the lesser-included offense of second-

5    degree murder would be attempted grand theft.

6         Petitioner argues that the trial court erred in requiring that the target offense for

7    second degree murder be attempted grand theft.  He does not explain why this was error or

8    cite any authority demonstrating that it was error, nor is there anything apparent from the

9    record indicating that the instruction was error.  He also does not explain, and there is no

10   explanation apparent from the record, how the instruction might have rendered the trial

11   fundamentally unfair in violation of due process.

12        Moreover, even if there had been error, it did not cause "actual prejudice."  The jury

13   convicted petitioner of the greater offense, first-degree felony murder.  Pursuant to the

14   instructions, this verdict had to be based on the jury's finding that petitioner aided and

15   abetted Jenkins in attempting to rob the Brinks truck, and that the homicide was a natural

16   and probable consequence.  Having found that petitioner and Jenkins committed attempted

17   robbery, a greater offense than attempted grand theft, it was bound by the instructions to

18   find first-degree murder.  Petitioner does not argue or cite any authority indicating that

19   California law would allow the jury, having found that petitioner and Jenkins committed

20   attempted robbery, to convict him simply of second-degree murder or any lesser offense

21   than first-degree murder.  As there is no dispute that the jury found that petitioner and

22   Jenkins committed attempted robbery, any error in including grand theft in the second-

23   degree murder instructions did not have a substantial and injurious effect on the verdict.

24        Petitioner also claims that he was deprived of a fair trial because his attorney was

25   absent at a "critical stage" of the proceedings, specifically when Jenkins's counsel

26   discussed with the court modifying the aiding and abetting instructions by adding attempted

27   grand theft. (Resp. Ex. F at 2838-41.)  The record indicates that counsel was present for

28   that discussion, however.  The discussion took place right before a lunch recess, when

1   petitioner's counsel, Levy, was present.  (*Id.* at 2838; Resp. Ex. A at 1064.)  The court

2   dismissed the jury for lunch, and the court remained in session with the parties, whereupon

3   Jenkins's attorney discussed the instructional issue with the court.  (Resp. Ex. F at 2838-

4   41.)  When the trial resumed following the lunch recess, all parties were present.  (*Id.* at

5   2841.)  As the record indicates that counsel was in fact present during the discussion of the

6   aider and abettor instructions, petitioner's claim of an unfair trial based on his attorney's

7   absence at a critical stage of the proceedings fails.

8          Petitioner is not entitled to habeas relief on these claims.

9   **XII.   Double Jeopardy**

10          Petitioner argues that his double jeopardy rights were violated because the

11  prosecutor was allowed to argue special circumstances surrounding the murder, and

12  petitioner claims he was "acquitted" of these special circumstances charges at the first trial.

13  "Well-settled Supreme Court precedent provides that a criminal defendant may not be

14  retried for a crime following an acquittal or conviction" on the same, a lesser-included or a

15  greater-inclusive offense.  *Wilson v. Czerniak*, 355 F.3d 1151, 1154-55 (9th Cir. 2004)

16  (citing *Brown v. Ohio*, 432 U.S. 161 (1977).

17          Petitioner's claim fails because he was neither "acquitted" of the special

18  circumstances charges in the first trial, nor were the special circumstances argued against

19  him in the second trial.  In his first trial, petitioner was charged with murder and two special

20  circumstances: that the murder was committed while lying in wait, and that the murder was

21  committed while he was an accomplice in the commission of attempted robbery.  (Resp.

22  Ex. A at 284-85.)  The trial court also instructed on aiding and abetting felony murder, i.e.

23  that a murder committed during the course of a robbery was first-degree murder.[9]  (*Id.* at

24  620-21, 623, 624.)  The jury convicted petitioner of first-degree murder but did not reach a

25

26          [9]The special circumstances of being an accomplice in the commission of attempted
    robbery has elements – having reckless indifference and being a major participant – that
27  differ from aiding and abetting felony murder, which, as described above, create liability for
    murder that is a natural and probable consequence of the attempted robbery that petitioner
28  aided and abetted.  (Resp. Ex. A at 618, 635-36.)

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   verdict on the special circumstances charged against petitioner, and those charges were

2   dismissed by the trial court on a motion by the prosecution.  (*Id.* at 539, 540, 544.)

3   Petitioner was tried again following the appellate court's reversal on the grounds that the

4   jury at the original trial had been coerced.[10]   At the retrial, the prosecutor argued that

5   petitioner had aided and abetted first-degree felony murder, but he did not recharge the

6   special circumstances that had been dismissed at the first trial, nor did he argue any

7   special circumstances against petitioner.  (Resp. Ex. F at 2618-19, 2640-42.)

8           From this record, it is clear that petitioner was not "acquitted" of special

9   circumstances charges at the first trial; rather, those charges were dismissed on the

10   prosecution's motion.  In any event, even if he had been acquitted of those charges, he

11   was not charged with special circumstances, nor did the prosecutor argue special

12   circumstances against him, at the second trial.  Consequently, petitioner's double jeopardy

13   rights were not violated.

14           Petitioner also claims that the Double Jeopardy Clause was violated because

15   evidence of his carjacking the getaway car was used at his second trial despite his acquittal

16   of carjacking at the first trial.  Petitioner was not charged with carjacking at the second trial,

17   and his acquittal on the carjacking charge at the first trial did not preclude the prosecutor's

18   simply using *evidence* of his carjacking at the second trial.  *See Charles v. Hickman*, 228

19   F.3d 981 (9th Cir. 2000).

20           Accordingly, petitioner's double jeopardy claims fail.

21   **XII.   Testimony of James Felix**

22           Petitioner claims that the trial court violated his rights under the Confrontation

23   Clause by excluding testimony of James Felix at a motion hearing.  Felix was the man

24   convicted of carjacking the car that was used several days later as the getaway car in the

25   Brinks robbery and shooting.  The trial court, after a hearing, admitted the evidence of the

---

27   [10]The court notes that retrying petitioner of first-degree murder after his conviction
was reversed on appeal did not violate double jeopardy principles.  *See Boston Municipal
Court v. Lydon*, 466 U.S. 294, 308 (1984) (Double Jeopardy Clause does not bar re-
28   prosecution of one whose conviction is overturned on appeal).

United States District Court

For the Northern District of California

1    carjacking.  (Resp. Ex. F at 808-821.)  A week later, and prior to the introduction of the

2    evidence, petitioner requested another hearing on its admissibility at which Felix be called

3    to testify whether he intended the car to be used later in the Brinks robbery.  (Resp. Ex. F

4    at 1368.)  The trial court found that no hearing was necessary because there was an

5    undisputed connection between the carjacking and the Brinks robbery, namely that the car

6    Felix carjacked was the getaway car in the Brinks incident, regardless of Felix's intent.  (*Id.*

7    at 1371, 1378.)  Eventually, the prosecutor introduced the carjacking evidence at trial, and

8    petitioner declined to call Felix as a trial witness.  (*Id.* at 1720.)

9         Petitioner's reliance on the Confrontation Clause is misplaced.  The Confrontation

10   Clause guarantees that a defendant may confront and cross-examine adverse witnesses.

11   *Pointer v. Texas*, 380 U.S. 400, 403, 406-07 (1965).  There is no allegation that petitioner

12   was not allowed to confront or cross-examine any witnesses.  Petitioner was given the

13   opportunity to cross-examine all witnesses who testified regarding the carjacking incident.

14   He was also allowed to call Felix as a witness at trial, but he declined to do so.  The trial

15   court's decision to admit the carjacking evidence without hearing Felix's testimony did not

16   prevent petitioner from confronting or cross-examining any witnesses or evidence against

17   him.  Consequently, there was no violation of the Confrontation Clause.

18        Petitioner also claims that the "state" prevented him from having access to Felix and

19   calling him to testify at trial, in violation of his right to a fair trial.  The Supreme Court has

20   made clear that the exclusion of critical, corroborative defense evidence may violate the

21   Sixth Amendment right to present a defense, as well as the due process right to a fair trial.

22   *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing cases).  The record

23   makes clear that neither the prosecutor nor the trial court prevented petitioner from finding

24   Felix and calling him to testify at trial.  The trial court issued an order to the to the California

25   Department of Corrections to bring Felix, who was in state prison, to Alameda County, to

26   be available to testify.  (Resp. Ex. A at 975-76.)  The trial court did not exclude Felix as a

27   trial witness, rather it was petitioner's counsel who decided not to call Felix to testify (*Id.* at

28   1720), presumably because he did not know whether or not Felix would give testimony

United States District Court

For the Northern District of California

1  helpful to petitioner.  (*Id.* at 813, 1368.)  Moreover, Felix's absence was not prejudicial

2  because, at best, Felix would have testified that he and petitioner did not plan to use the

3  carjacked car for the Brinks robbery, which would have been duplicative of petitioner's

4  testimony that it was a coincidence that the same car was used.  Petitioner's claim fails

5  because the record clearly indicates that he was not prevented access to Felix and was

6  allowed to call him at trial, and there is no indication of any prejudice from Felix's absence.

7        Accordingly, petitioner is not entitled to habeas relief on his claims that his

8  Confrontation Clause rights were violated or that the state prevented him from reaching

9  having Felix testify at trial.

10                                    **CONCLUSION**

11        For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The

12  clerk shall close the file.

13        **IT IS SO ORDERED.**

14  Dated: August 25, 2009.                    _____

15                                                  PHYLLIS J. HAMILTON
                                                United States District Judge

16

17  G:\PRO-SE\PJH\HC.05\MCDANIELS904.RUL.wpd

18

19

20

21

22

23

24

25

26

27

28

33